# United States Court of Appeals for the Federal Circuit

2006-1569, -1606

GENERAL MILLS, INC.,

Plaintiff-Appellant,

v.

KRAFT FOODS GLOBAL, INC.

Defendant-Cross Appellant.

Ronald J. Schutz, Robins, Kaplan, Miller & Ciresi L.L.P., of Minneapolis, Minnesota, argued for plaintiff-appellant. With him on the brief was, David P. Swenson, Sang Young A. Brodie, and David B. Zucco.

Holly A. Harrison, Sidley Austin LLP, of Chicago, Illinois, argued for defendant cross-appellant. With her on the brief was Julie K. Potter. Of counsel on the brief was Tara C. Norgard, Carlson Caspers Vandenburg & Lindquist P.A., of Minneapolis, Minnesota.

Appealed from: United States District Court for the District of Minnesota

Judge Joan N. Ericksen

# United States Court of Appeals for the Federal Circuit

2006-1569, -1606

GENERAL MILLS, INC.,

Plaintiff-Appellant,

v.

KRAFT FOODS GLOBAL, INC.,

Defendant-Cross Appellant.

_____

DECIDED: May 16, 2007

_____

Before BRYSON, Circuit Judge, CLEVENGER, Senior Circuit Judge, and LINN, Circuit Judge.

LINN, Circuit Judge.

General Mills, Inc. ("General Mills") appeals from a final judgment by the United States District Court for the District of Minnesota dismissing its claim for patent infringement against Kraft Foods Global, Inc. ("Kraft"), on the ground that the claim is barred by a covenant not to sue that General Mills granted to Kraft's predecessor in interest, the Farley Candy Company ("Farley"). Kraft cross-appeals, challenging the district court's decision to treat its counterclaim to General Mills' original complaint as having been abandoned after General Mills filed an amended complaint. Because Kraft became the successor to Farley's rights under the covenant not to sue before commencing the allegedly infringing activities and did not lose that status during the period at issue on appeal, and because the district court did not abuse its discretion in deeming Kraft's counterclaim to have been abandoned, we affirm as to both appeals.

# I.    BACKGROUND

## A.    Facts

General Mills sells rolled food items under the brand name Fruit by the Foot®, and it owns U.S. Patent Nos. 5,284,667 ("Rolled Food Item Fabricating Methods") and 5,723,163 ("Rolled Food Item").  In 1995, General Mills sued Farley for infringement of these patents, a dispute that General Mills and Farley resolved through a settlement agreement (hereinafter, "the Settlement Agreement").[1]  The Settlement Agreement required Farley to pay General Mills a lump sum in exchange for the grants by General Mills of a release of its patent claims and a covenant not to sue Farley for past, current, or future infringement.  "Farley" is defined in Article 1.6 of the Settlement Agreement to mean "Farley Candy Company and its Affiliates, including, without limitation, all parent corporations, subsidiaries, heirs, executors, administrators, and corporate predecessors and <u>successors</u>."  (Emphasis added.)  The covenant not to sue, which was attached as Exhibit B to the Settlement Agreement, also contains language defining the "Releasee" as including Farley and its "successors."

The Settlement Agreement also contains two provisions, Articles 8.3 and 8.4, that define limiting conditions to the assignment or transfer of rights under the Agreement to another party by Farley (or its successors, pursuant to Article 1.6 and the language of the covenant):

---

[1]    Because the Settlement Agreement was attached to General Mills' amended complaint, we may consider its terms despite the fact that the trial court entered judgment after granting a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  We recite the remainder of the facts as General Mills alleges them, and we assume them to be true for purposes of this decision.  <u>See</u> <u>Holden Farms, Inc. v. Hog Slat, Inc.</u>, 347 F.3d 1055, 1059 (8th Cir. 2003); <u>Hair v. United States</u>, 350 F.3d 1253, 1256 (Fed. Cir. 2003).

8.3     Except as expressly provided in Article 8.4 herein, neither this Agreement nor any rights granted hereunder may be assigned or otherwise transferred by either General Mills or Farley, nor shall the same inure to the benefit of any trustee in bankruptcy, receiver or other successor of such party, whether by operation of law or otherwise, nor, except as expressly provided in Article 8.4 herein, shall any rights herein be or become in any way directly or indirectly transferable or available to, or divisible or capable of being shared with, any third party, without the prior written consent of the other party, and any assignment, transfer or other disposition without such prior written consent shall be null and void.

8.4     Notwithstanding any provision of this Agreement to the contrary, Farley may assign the entirety of their non-divisible respective rights and obligations under this Agreement, provided that all of the following conditions are satisfied:

     a.     Farley must transfer its entire rolled food product business, including without limitation all assets, good will, and trademarks to the party to whom the rights and obligations are being assigned; and

     b.     Farley must provide General Mills with sixty (60) days written notification prior to the transfer of rights and obligations under this Agreement; and

     c.     the party receiving the rights and obligations from Farley must not have been charged with infringement by written notification or initiation of litigation by General Mills of any of General Mills' Patents and Applications, as those terms are defined herein, prior to General Mills receiving written notification from Farley pursuant to Article 8.4(b).

In 2001, through a series of intermediate transactions, Kraft succeeded to the business of Farley. At the time of these transactions, Kraft and Farley complied with the requirements of Articles 8.3 and 8.4. (We refer to these transactions collectively as "the Farley transaction.") General Mills concedes that by virtue of the Farley transaction in 2001, Kraft stepped into Farley's shoes and became Farley's successor. See Oral Arg. at 02:35–02:45, available at http://www.cafc.uscourts.gov/oralarguments/mp3/06-1569.mp3; see also Amended Complaint ¶ 15; Br. for Appellant at 20–21.

In 2002, Kraft "sold and transferred Farley assets, including the Farley trademark and goodwill, to a subsidiary of Catterton Partners." Amended Complaint ¶ 16. Because this appeal is from the grant of a motion to dismiss, the details of this

transaction are not in the record, but it appears to be undisputed that Kraft retained at least some portion of the original Farley assets and of Farley's rolled food business, although General Mills characterizes the assets that Kraft sold to Catterton as "substantial" and "important." Br. for Appellant at 3; Repl. Br. for Appellant at 13. (We refer to this transaction as "the Catterton transaction.")

After a few years of what General Mills alleges to be infringing activity, in 2005, Kraft sold the remainder of its rolled food business and purported to transfer whatever rights it had under the Settlement Agreement to Kellogg Company. (We refer to this transaction as "the Kellogg transaction.") General Mills does not allege that Kraft engaged in infringing activities after the Kellogg transaction; this appeal concerns acts of alleged infringement only during the period between the Catterton transaction and the Kellogg transaction.

### B.    Procedural History

General Mills brought this action in the United States District Court for the District of Minnesota on June 24, 2005, alleging infringement of the two patents listed above. On September 14, 2005, Kraft filed an answer and a counterclaim alleging that General Mills breached the Settlement Agreement by filing suit. General Mills replied to Kraft's counterclaim, and Kraft moved for summary judgment. Subsequently, on December 2, 2005, General Mills filed an amended complaint in which it reasserted the patent infringement claim from the original Complaint and asserted a new breach of contract claim of its own, on the grounds that Kraft breached the Settlement Agreement when it engaged in the Kellogg transaction.

The amended complaint, unlike the original complaint, attached the Settlement Agreement as an exhibit. Relying on the Settlement Agreement, Kraft moved to dismiss both counts of the amended complaint under Fed. R. Civ. P. 12(b)(6). Kraft never answered the amended complaint or reasserted its counterclaim. After full briefing, the district court granted Kraft's motion to dismiss and dismissed General Mills' patent infringement claim. General Mills, Inc. v. Kraft Foods Global, Inc., No. 05-CV-1253 (D. Minn. June 28, 2006) (Dckt. No. 110) ("Dismissal Opinion"). Exercising its discretion under 28 U.S.C. § 1367(c)(3), the district court then declined to exercise jurisdiction over General Mills' state-law contract claim and entered judgment in favor of Kraft.

After the entry of judgment, Kraft wrote to the district court and sought guidance as to how it should proceed with its counterclaim. The district court construed Kraft's letter as a motion to alter or amend the judgment and denied the motion, explaining that because Kraft did not reassert its counterclaim in response to the amended complaint, no counterclaim was pending when the district court entered judgment and that the judgment was therefore final and complete. General Mills, Inc. v. Kraft Foods Global, Inc., No. 05-CV-1253 (D. Minn. July 5, 2006) (Dckt. No. 114).

General Mills appeals. Kraft cross-appeals, alleging that the district court erred by failing to rule on its counterclaim. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

### A. Standard of Review and Choice of Law

"The question of whether a Rule 12(b)(6) motion was properly granted is a purely procedural question not pertaining to patent law, to which this court applies the rule of

the regional . . . circuit," in this case the Eighth Circuit. C&F Packing Co. v. IBP, Inc., 224 F.3d 1296, 1306 (Fed. Cir. 2000). The Eighth Circuit "review[s] de novo the district court's grant of a motion to dismiss pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint as true and granting every reasonable inference in favor of the nonmovant." Knieriem v. Group Health Plan, Inc., 434 F.3d 1058, 1060 (8th Cir. 2006).

The Settlement Agreement provides in Article 8.9 that it is to be interpreted under Minnesota law. General Mills concedes this point, but then argues that under federal law, patent licenses (such as, in its view, the Settlement Agreement) are personal and non-transferable. However, what our case law recognizes is the "need for a uniform national rule that patent licenses are personal and non-transferable in the absence of an agreement authorizing assignment." Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp., 284 F.3d 1323, 1328 (Fed. Cir. 2002) (emphasis added). Thus, we reject General Mills' argument and construe the Settlement Agreement, including its assignment provisions, under Minnesota law. In so doing, we do not decide the scope of the rule articulated in Rhone-Poulenc in other contexts where the parties have not agreed to their own assignment provisions or where other sources of law, such as the Bankruptcy Code, might trump ordinary contract provisions. See Everex Sys, Inc. v. Cadtrak Corp. (In re CFLC, Inc.), 89 F.3d 673, 676, 679 (9th Cir. 1996) (applying federal patent law rather than state contract law to the question of whether "applicable law" excused the patentee from recognizing an assignment of rights that was otherwise permissible under the bankruptcy laws (quoting 11 U.S.C. § 365(c)(1)(A))).

## B. Kraft's Status as Successor to Farley

As mentioned above, General Mills concedes that Kraft became Farley's successor by virtue of the Farley transaction. General Mills does not allege infringement prior to the Farley transaction or between the Farley transaction and the Catterton transaction. Rather, General Mills argues that "[t]he Catterton Transaction divested Kraft of any rights it might have had under the Settlement Agreement, because without the Farley assets that were sold to Catterton Partners, Kraft cannot be 'Farley' under the Settlement Agreement." Amended Complaint ¶ 18.

The part of the Settlement Agreement from which General Mills derives this argument is Article 8.4, which requires that Farley (including its successors, under Article 1.6) "must transfer its entire rolled food business" if it wishes to assign its rights under the Settlement Agreement without General Mills' consent. Article 8.4, General Mills argues, "makes certain that the Farley Agreement remains with Farley's entire rolled-food business." Br. for Appellant at 18. However, as the district court correctly recognized, the Settlement Agreement speaks only to the assignment of rights: "[n]either article [8.3 or 8.4] addresses Farley's retention of the Settlement Agreement and sale of other assets." Dismissal Opinion, slip op. at 5. Because the Catterton transaction did not purport to assign Kraft's rights under the Settlement Agreement, the restrictions imposed by Article 8.4 simply do not apply.

Nor does any other provision of the Settlement Agreement bar Farley from retaining its rights under the agreement when it transfers parts of its rolled food business. As mentioned, General Mills does not dispute that pursuant to Article 8.4, Kraft became Farley's successor before the Catterton transaction. Accordingly, the

question is not whether Kraft complied with the conditions necessary for it to become Farley's successor. The question is whether the Settlement Agreement imposed conditions on Kraft's continuing entitlement to the covenant not to sue. Although General Mills and Farley could have agreed to impose on Farley or Farley's successor ongoing obligations such as the retention of specified assets, they did not do so. There is simply nothing in the contract that requires Kraft to retain all or any particular assets of the Farley business to preserve Kraft's status as successor.

General Mills nonetheless argues that general principles of successorship prevent Kraft from continuing as "Farley" or a "successor" once it had sold off assets that were part of the original Farley business in the Catterton transaction. For General Mills to prevail, Kraft's rights under the agreement must have either (1) terminated by operation of law at the time of the Catterton transaction, or (2) been transferred from Kraft to Catterton by operation of law or by the terms of the Catterton transaction. We are not persuaded that either of these eventualities has occurred.

The limited authority that General Mills cites in support of the first possibility serves only to support Kraft's position. At least in the context of insurance contracts, Minnesota courts avoid construing contracts so as to forfeit a party's rights "unless such an intent is manifest in 'clear and unambiguous' language." Nathe Bros. v. Am. Nat'l Fire Ins. Co., 615 N.W.2d 341, 344 (Minn. 2000). We have taken a similarly dim view of purported forfeitures of patent rights, as have other courts. See Stark v. Advanced Magnetics, Inc., 29 F.3d 1570, 1573 (Fed. Cir. 1994) ("'[F]orfeitures are never favored. Equity always leans against them, and only decrees in their favor when there is full, clear and strict proof of a legal right thereto.'") (quoting Henderson v. Carbondale Coal

& Coke Co._, 140 U.S. 25, 33 (1891)); <u>Tol-O-Matic, Inc. v. Proma Produkt-Und Marketing</u> <u>Gesellschaft m.b.H.</u>, 945 F.2d 1546, 1554 (Fed. Cir. 1991) ("Forfeiture is not favored as a remedy for actions not shown to be culpable.") (quoting <u>Jones v. New York Guaranty</u> <u>& Indemnity Corp.</u>, 101 U.S. (11 Otto) 622, 628 (1879), for its statement that "equity abhors forfeitures"); <u>United Mfg. & Serv. Co. v. Holwin Corp.</u>, 187 F.2d 902, 905 (7th Cir. 1951) ("Our courts generally take a strict view on attempted revocations or forfeitures of license agreements.  The court dislikes forfeitures."). <u>See generally</u> <u>Corbin</u> <u>on Contracts</u> § 39.10 (2006) (stating that "[c]ourts do not favor forfeitures" and noting that even "express conditions 'subsequent' will be regarded with disfavor if they are such as to cause a forfeiture, that is, if they permit a party to keep benefits received under the contract without giving their agreed equivalent").  In this case, as discussed above, General Mills can point to no provision of the Settlement Agreement that the Catterton transaction might breach, much less one that would result in Kraft forfeiting all of its ongoing rights under the contract.  Indeed, General Mills concedes that the Catterton transaction was permitted under the Settlement Agreement.  <u>See</u> Oral Arg., <u>supra</u>, at 02:50–03:05.  As a result, there is no basis for concluding that Kraft's rights under the agreement were terminated by operation of law at the time of the Catterton transaction.

As to the second possibility—that Catterton became Farley's successor after the Catterton transaction and divested Kraft of that status—General Mills does not even make this argument.  The record contains no allegations as to what law controls the Catterton transaction or what assets, aside from Farley's goodwill and trademarks, Kraft transferred to Catterton.  However, we note that the general rule of corporate law is that

a transaction involving a transfer of property "from one corporation to another without consolidation or merger, does not include a transfer of all the powers or immunities of the selling corporation." Victoria A. Braucher et al., 15 Fletcher Cyclopedia of the Law of Private Corporations § 7085 (rev. ed. 1999); see also J.F. Anderson Lumber Co. v. Myers, 206 N.W.2d 365 (Minn. 1973) (citing 15 Fletcher Cyclopedia of Corporations § 7122 for the "general rule" that "where one company sells or transfers all its assets to another company, the purchasing company is not liable for the debts and liabilities of the transferor" absent a merger, a consolidation, or certain other conditions not applicable here). Here, not only did the Catterton transaction not involve a merger or consolidation, but there is not even an allegation that Catterton acquired the entirety of Farley. Indeed, had Kraft not retained at least some part of Farley's rolled food business after the transaction, General Mills could not have alleged infringement. There is simply no basis from which we might conclude that anyone other than Kraft succeeded to Farley's rights under the Settlement Agreement, at least until the Kellogg transaction.

There is also no merit to General Mills' argument that the Catterton transaction excused General Mills' obligation to perform under the Settlement Agreement pursuant to the doctrine of impossibility. It is true that after the Catterton transaction, Kraft no longer owned the Farley name and all of Farley's assets. But this fact did not prevent General Mills from affording Kraft the same rights under the Settlement Agreement that it had possessed since the Farley transaction. In the other direction, Kraft's only obligation that the Catterton transaction might possibly interfere with—the requirement in Article 8.4 that Farley "transfer its entire rolled food product business"—applies only

when Farley or its successor purports to assign its rights under the Settlement Agreement. At the time of the Catterton transaction, no one alleges that this occurred.

Accordingly, we hold that at least until the Kellogg transaction, Kraft was entitled to the protection of Farley's covenant not to sue, and the district court properly dismissed General Mills' patent infringement claim against Kraft.[2] In so holding, we express no opinion as to whether the Kellogg transaction could or did comply with the Settlement Agreement, whether Kraft "transfer[red] [either Kraft's or Farley's] entire rolled food business" in the Kellogg transaction, or whether Kellogg became Farley's successor. We need not reach these issues because Kraft's allegedly infringing activities ceased with the Kellogg transaction.

### C. Kraft's Counterclaim

On cross-appeal, Kraft challenges the district court's holding that "Kraft did not have a counterclaim pending when judgment was entered." General Mills, Inc. v. Kraft Foods Global, Inc., 05-CV-1253 (D. Minn. July 5, 2006) (order in response to Kraft's letter of June 30, 2006, construed as a "request for permission to file a motion to reconsider," see D. Minn. L.R. 7.1(g)) (Dckt. No. 114). As the district court observed, Kraft had filed a counterclaim to General Mills' original complaint, but that complaint was superseded by General Mills' amended complaint, and at the time the district court entered judgment, Kraft had not filed an amended answer re-pleading the counterclaim. Id. However, Kraft argues that its counterclaim remained extant at least until the deadline for filing an amended answer, and that this deadline had not yet passed when the district court entered judgment. According to Kraft, Kraft's timely filing of a motion to

---

[2] General Mills does not challenge on appeal the district court's decision to decline jurisdiction over its breach of contract claim.

dismiss under Fed. R. Civ. P. 12(b)(6) tolled the deadline for filing a responsive pleading until 10 days after the motion was ruled upon.

The relevant tolling provision is found in Fed. R. Civ. P. 12(a)(4)(A). Although neither party cites authority that construes Rule 12(a)(4)(A)—and we have found none ourselves—by the terms of that rule, the filing of a motion to dismiss does not extend the time for filing an answer to an amended complaint, at least in the circumstance here where the time for responding to the original complaint has already run. Rule 12(a)(1)–(3) sets forth the deadlines for answering original complaints and cross-claims under various circumstances. Rule 12(a)(4) then provides that "[u]nless a different time is fixed by court order, the service of a motion permitted under this rule [including a Rule 12(b)(6) motion to dismiss] alters these periods of time" so as to extend the deadline until a motion is ruled upon. Fed. R. Civ. P. 12(a)(4) (emphasis added). However, the time for answering an amended complaint is not one of "these periods of time." Rather, the deadline for responding to an amended complaint is established separately under Rule 15: "A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders." Fed. R. Civ. P. 15(a).

Thus, because no time "remain[ed] for response to the original pleading" when General Mills filed its amended complaint, Kraft had only 10 days after service of the amended complaint—not 10 days after the district court's ruling on the motion to dismiss—to file an answer and counterclaim or take such other action as may have

been permitted to protect its interests.[3]  Because Kraft did not do so before its deadline had passed, the district court did not abuse its discretion in finding that Kraft had abandoned its counterclaim.  See Johnson v. Berry, 228 F. Supp. 2d 1071, 1079 (E.D. Mo. 2002) (holding that a counterclaim was abandoned when the defendant failed to respond to an amended complaint).

## III.     CONCLUSION

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

[3]     Kraft's 10-day deadline to plead in response to the amended complaint was extended by approximately one month—from December 16, 2005, to January 17, 2006—by a stipulation approved by the district court on December 14, 2005.  General Mills, Inc. v. Kraft Foods Global, Inc., No. 05-CV-1253 (D. Minn. Dec. 14, 2005) (agreed order) (Dckt. No. 43).  The extension of time altered Kraft's deadline to "respond to the Amended Complaint," id., but does not affect our analysis.